LORA J. ROTEN et al., Complainants and Appellees, v. F. M. HICKS, ALBERT M. HICKS, et al., Defendants and Apellants. —338 S. W. (2d) 225.

Western Section at Jackson.  February 26, 1960.

Certiorari Denied by Supreme Court September 9, 1960.

314

· Will Terry Abernathy, Glenn H. Whitlow, Selmer, for original complainant.

Will Tom Abernathy, Selmer, for original appellee.

AVERY, P. J. (W. S.).   This cause was heard before the Chancellor on oral testimony by consent of the parties, and the bill of exceptions consists of about two typewritten pages purporting to show the substance of the proof in greatly condensed narrative form.

Certified copies of all the deeds and transactions which occurred with respect to the real estate are exhibits to the pleadings, and made parts thereof.

The question to be determined is whether or not, at the time the bill was filed in this cause, Albert M. Hicks was the owner, in fee simple, of the tract of land involved, conveyed to him by his father, F. M. Hicks, who died after the suit was instituted, or whether by virtue of the method by which F. M. Hicks held the recorded title before he attempted to convey it to his son, Albert M. Hicks, he possessed said lands so that he held it in trust for his children, only one of whom was his said son, Albert M. Hicks.

The learned Chancellor filed a 4-page Memorandum Opinion which appears as a part of the transcript of the technical record.   The Chancellor held that F. M. Hicks,

who had obtained a deed from the State after the tax sale in the manner hereinafter set out, was a tenant by curtesy prior to his purchase of the land from the State and thereafter he held said land in trust for the children of himself and his deceased wife.

The original bill was filed by Lora J. Roten and Ruth Dunaway against F. M. Hicks, Albert M. Hicks, Grace McGee, Gladys Cooper, and Oliver Hicks, who are all and the only children and heirs at law of their mother, Mary Russom Hicks, deceased. F. M. Hicks, the father of these six children, was made a defendant and the stipulation shows his death pending the litigation.

The purpose of the bill was to have the title decreed as vested in said six children as tenants in common, and have a partition of said real estate, by sale, among them. The Chancellor having held that the real estate belonged to said children as tenants in common, ordered a sale of said property for division in accord with his Decree, and from that Decree he granted an appeal to this Court by the defendant Albert M. Hicks, who claimed to own said real estate in fee. This appeal was perfected, errors assigned, the cause heard by this Court, and is disposed of by this Opinion.

The answer to the original bill and the pleas filed thereto, and the contention made by the defendant, is that—

(a) Sarah Jane Russom, the widow of W. Q. Russom, deceased, had a homestead or dower interest, or a life estate in said lands;

(b) F. M. Hicks had no curtesy estate in the lands in question;

(c) Complainants were guilty of such laches as prevented a recovery by them of any interest in said lands;

(d) The children of Mary Hicks did not hold title to said lands as tenants in common;

(e) Albert M. Hicks had a recorded muniment of title for more than 7 years before the bill was filed, and therefore no cause of action accrued prior to that period of limitations; and that Albert M. Hicks held fee simple title to said lands by virtue of the deed from his father, F. M. Hicks.

The Chancellor seems to have decided each of the issues advanced by defendants against them, and Assignments of Error from I to V, inclusive, raise the same questions as were raised by the answer and pleadings.

It should be said that Ancil Ferguson, a purchaser of certain timber from the involved lands was made a defendant, but the bill was later dismissed as to him and he has no issue pending before this Court.

Demurrer was filed to the bill by Albert M. Hicks, which raised the question of the curtesy right of F. M. Hicks, as shown by the face of the bill. The statute of seven years adverse possession, T. C. A. sec. 28-201 et seq., was plead, and that the deed from F. M. Hicks, the father of Albert M. Hicks, to the said Albert M. Hicks vested him with good and indefeasible title in fee to the land.

The answer of Grace McGee, Gladys Cooper, and Oliver Hicks states that it is their belief that their co-defendant-brother, Albert M. Hicks, has good and indefeasible title, legal and equitable, in said real estate,

and that "they disclaim any and all right, title, interest or claim in and to the land involved in this suit".

A careful reading of the original bill clearly shows that the right of action on the part of the complainants to establish that the six children of Mary Hicks each own a 1/6th interest in said lands, was based upon the theory that after the death of W. Q. Russom, the lands were inherited by his said two daughters, subject to the homestead interest of his widow, and that after the partition deeds first executed after his death between these two daughters and their respective husbands, whereby the lands were divided, the widow of W. Q. Russom owned the life estate in all the lands and held it as a homestead; that Mrs. Hicks then owned a remainder interest subject to both the homestead and dower right of her mother, and that her husband had a curtesy right in the real estate, if he survived her.

The complainants by their original bill averred that F. M. Hicks had a curtesy right, as the husband of Mary Hicks who owned the remainder interest in the lands after division between her and her sister, subject to the life estate which is averred to be a homestead outstanding in her mother, who survived the said Mary Hicks; that F. M. Hicks became possessed of that curtesy right after the death of his wife subject to a life estate of his mother-in-law; that being the father of the six children of Mary Hicks, deceased, all the subsequent transactions that occurred, in view of the fact that he owned the curtesy right, created a trust for the benefit of each of his children and that he had no right to make a conveyance to anyone which would defeat the inheritance of the children of Mary Hicks.

In the prayer of the original bill and in Sec. 7 thereof, it is prayed that the land be sold "subject to the curtesy estate of F. M. Hicks", who was then living.

An amendment to the original bill was later filed in which it quoted all the allegations of the original bill which averred that the said F. M. Hicks was possessed of a curtesy right, asked that all said averments in that respect be stricken from the original bill, and that there be inserted in paragraph designated with Roman Numeral IV, the following:

"That the said F. M. Hicks has lived upon the land, occupied and used it as his own before and since the date of the partition deed referred to under Roman Numeral II".

And further, after striking out all of the allegations with respect to curtesy right of F. M. Hicks, there be inserted in paragraph designated Roman Numeral V the following:

'They further state that F. M. Hicks, as their father, occupied a position of trust at the time he paid the back taxes and took the deed from the State of Tennessee, and that such payment made by him was in a fiduciary capacity for the benefit of the common interest, and the complainants stand ready and willing to contribute their proportionate part of the amount actually expended by him in the payment of the taxes."

It also struck from the prayer of the original bill the words:

"That the land be ordered sold for partition subject to the curtesy estate of F. M. Hicks."

Therefore, it would seem that the complainants by their amendments planted themselves wholly upon the theory that the father, having lived on the land after the death of their mother, plus the fact that his relationship to them was that of father, created such a fiduciary relationship as that his deed from the State of Tennessee, supplemented by the partition deed between his brother-in-law Moore and himself, was a transaction for the benefit of all and each of the children alike. After the amendment was offered the Court overruled the demurrer and allowed defendants 30 days to answer the amended, bill.

When the answer was filed by defendant, Albert M. Hicks, to the bill as amended, this answer contained the following:

" * * * defendant would now show to the Court that the bill as amended seeks the relief prayed for solely upon the allegation, charge and theory that F. M. Hicks, father of defendant and complainants, occupied a position of trust and acted in a fiduciary capacity in purchasing the land in question from the State of Tennessee and that his action in so doing inured to the benefit of complainants. Defendant now states that all allegations set forth in the bill in support of such theory are erroneous in fact and in law, and all of said allegations are emphatically denied. Furthermore, defendant would state and show to the Court that his father, F. M. Hicks, had no interest, legal or equitable, in the land in question prior to the purchase thereof from the State of Tennessee, and that he became the absolute owner of the land upon execution and delivery of the partition

deed by Dee Moore, and that he had a good and perfect right to convey said land to the defendant.''

The history of the title to said lands, as shown by the technical record and the narrative bill of exceptions, is as follows:

1. W. Q. Russom owned the land involved in the same tract with other lands in fee simple at the time of his death, intestate, on October 5, 1931.

2. He was survived by his widow, Sarah Jane Russom, and two children, Belle Russom Moore who was then married to Dee Moore, and Mary Russom Hicks who was then married to F. M. Hicks, all adults.

3. That both daughters and their respective husbands were living when W. Q. Russom died.

4. On April 20, 1933, Mary Hicks and her husband, and Belle Moore and her husband, executed deeds by which the lands owned by W. Q. Russom at the time of his death were divided.

5. These deeds contained the exact phraseology except that in one the grantors are shown to be Belle Russom Moore and her husband, and in the other Mary Russom Hicks and her husband, and the respective grantees the same. That is, on the deed to the Hicks it states that the Moores—

''have this day bargained and sold to F. M. Hicks and wife, Mary E. Hicks, for the consideration of a division of property''

(then follows the description, immediately after which the respective deeds contained the following identical clause):

"* * * conveys our one-half undivided interest in and to all the lands now owned by Mrs. W. Q. Russom and heirs. This conveyance is also subject to the life estate of the said Mrs. W. Q. Russom, who holds said land as a homestead during her lifetime."

In the covenanting clause of each of the deeds is the following identical statement:

"* * * that we are lawfully seized of said land, and have a good right to convey the same, and that it is unincumbered in any way except the above mentioned homestead, and we bind ourselves and heirs to warrant and forever defend the title of the same to the said F. M. Hicks and wife, Mary E. Hicks, and their heirs forever, against the lawful claims of all persons."

6. Eight days after the execution of those partition deeds, which undertook to convey the lands to the respective wives and husbands as tenants by the entirety, and on April 28, 1933, Mary Russom Hicks died, leaving surviving her, her said husband and her said six children, and her mother, the said Sarah Jane Russom, widow.

7. That on July 6, 1936, Sarah Jane Russom, the widow, died.

8. That from the date of the death of W. Q. Russom in 1931 to the date of the death of his said widow, Sarah Jane Russom, no taxes had been paid on the lands of which he died seized and possessed.

9. That by a proper legal proceeding, all lands owned by W. Q. Russom at the time of his death, were sold on August 28, 1940, for the delinquent taxes that had ac-

crued for the year 1931, and that by the decree of sale which does not appear in the record, but by stipulation—

"* * * the title was divested out of W. Q. Russom and those claiming under him and vested in the State of Tennessee, subject alone to the right of redemption for a period of two years from the date of confirmation."

10. It is stipulated that no redemption occurred during the period of two years, and that on September 16, 1942, the State of Tennessee quit-claimed said entire lands to Dee Moore and F. M. Hicks. Certified copy of that deed from the State appears in the record, executed by George F. McCanless, Commissioner of Finance and Taxation. It contains the necessary recitations, appears in all things regular, and shows the consideration to be as follows:

"Now, Therefore, in consideration of the premises and the payment by the grantee herein to the Clerk and Master of said Court of the sum of Seventy Three Dollars ($73.00), being the total amount of State taxes together with total interest, penalties, attorney fees and Court costs due on said land for the years 1930 through 1941, together with the further sum of Two Hundred, Fifty Dollars ($250.00) for which the proper officials of said county of McNairy have recommended that said County and city taxes be settled and compromised for the year 1930 through 1941, and the grantee having assumed the payment of all taxes which have accrued on said land since said last mentioned year, and the time for redemption of said land having expired, I, the Commissioner of Finance and Taxation for the State of Tennessee", etc.

The Commissioner, in his official capacity, conveyed the lands which are referred to therein as being the lands that were "ordered sold, as the property of W. Q. Russom", located in the old 6th civil district of said County and described by giving the names of the adjoining landowners, and containing 210 acres.

11. On August 30, 1945, the said purchasers from the State, Dee Moore and F. M. Hicks, executed respective deeds to each other, by which they divided said lands, with the exact description shown as in the original partition deed between them and their two respective wives, daughters of W. Q. Russom, deceased, after which description the deed to F. M. Hicks contains the following statement:

"This conveyance, conveyed a one-half and a divided interest in and to all the land now owned by F. M. Hicks and Dee Moore by deed from State of Tennessee, which land was formerly owned by W. Q. Russom Estate. And deeded to the above parties by the State of Tennessee, recorded in Book 33, page 124, on Oct. 3, 1942."

The deed to Dee Moore contains the following statement:

"This deed is made on an agreed division of the W. Q. Russom land, but deeded to Dee Moore and F. M. Hicks by the State of Tennessee of record in the Register's Office in Book No. 33, page 124."

These deeds contained the usual covenants and warranties as if the fee simple title were conveyed.

12. On August 31, 1945, the next day after the division by deeds between Moore and Hicks were executed, F. M. Hicks conveyed to his son, Albert M. Hicks, for a recited

consideration of $750.00, the identical land described in the original partition between the two daughters of W. Q. Russom, deceased, and their respective husbands in the division of the property to the Hicks, and immediately after the description contained the following:

"This land is the same land that was formerly owned by W. Q. Russom and heirs, the same land that was conveyed to F. M. Hicks and Dee Moore, but this tract herein deeded in this conveyance was deeded to me by Dee Moore as a division of above named tract deeded to us by the State and recorded in Deed Book 33, page 124. And Book 36, page 342 and from Dee Moore to F. M. Hicks, on August 30th 1945."

The covenants and warranties are the same as found in deeds that convey an absolute fee simple title.

13. That after Albert M. Hicks had gotten that deed he sold timber off this land to one Tom Jeff Hurst for $1,000, and later bargained to sell an additional $1500 of timber to Ancil Ferguson by timber deed dated August 11, 1956, which transaction had not been consummated and was invalidated by agreement.

14. That Albert M. Hicks remodeled an old house on the land and lived therein, and that F. M. Hicks lived in another house on the land to the date of his death.

The narrative bill of exceptions shows that Albert M. Hicks and his sister, Grace McGee, testified that all the children of F. M. Hicks were given an opportunity to participate in the tax sale, and Lora J. Roten and Ruth Dunaway testified that they were not asked to participate in said tax sale.

The information contained in this record with respect to the procedure in the Court when the lands were sold to the State for taxes is very meager, but the parties having stipulated that this sale was made by the Court and that it divested title out of W. Q. Russom and those claiming under him, this Court can do nothing but assume that they were proper parties to that suit, even though the dates given clearly show that the proceedings were instituted long after the date of death of W. Q. Russom, and the sale made to the State as above shown.

As to the deeds executed first after the death of W. Q. Russom between the two daughters who owned the fee and their respective husbands, the learned Chancellor held:

"The Court is of the opinion that the effort to make their husbands tenants by the entireties, in the above deeds was ineffectual. The result of these conveyances was a partition in kind of the land, subject to the Homestead and Dower rights of Sarah Jane Russom. The husbands took nothing."

No contention is made in this Court that the respective deeds created an estate by the entireties. Certainly the husbands "took nothing".

As to the status of the title on the death of Mary Hicks, the Chancellor found:

"Thereupon, the six children of Mary Hicks became the owners as tenants in common of that portion of the land allotted to Mary Hicks in the division made between her and her sister, Belle Moore, subject, of course, to the unassigned Homestead and Dower of their grandmother, Sarah Jane Russom,

and the estate by the curtesy of their father, F. M. Hicks. Shearin v. Shearin, 161 Tenn. 172 [29 S. W. (2d) 254]."

It is expressly said in Shearin v. Shearin, supra, that—

"One cannot be tenant by the curtesy of a remainder or reversion, expectant upon an estate of freehold, unless the particular estate has determined during the coverture. Reed v. Reed, 40 Tenn. (3 Head) 492, 75 Am. Dec. 777; Prater v. Hoover, 41 Tenn. (1 Cold.) 544; Upchurch v. Anderson, 62 Tenn. (3 Baxt.) 410; Verhine v. Ragsdale, 96 Tenn. 532, 35 S. W. 556."

All that Shearin v. Shearin held was that the husband of the deceased daughter in that case was entitled to the curtesy right in that part of the real estate, or its proceeds, that was not covered by the life estate of the widow of the deceased owner.

We think the Chancellor did not properly interpret the applicability of the Opinion in Shearin v. Shearin, supra, as related to the facts of the instant case, when he said that curtesy of F. M. Hicks attached to said lands because there had been no court proceeding setting apart the homestead and dower. No creditors' rights are involved and the only persons who could have objected to the claim of the mother to the entire lands as homestead, had so ratified that claim by their solemn deeds to each other. There was no administration of the W. Q. Russom estate revealed by the record.

In this holding we think the Chancellor erred, particularly in his statement that F. M. Hicks had a curtesy right. At that time, April 28, 1933, Sarah Jane Russom,

the mother of Mary Hicks and the widow of W. Q. Russom, was alive and by the deeds of partition the deceased, Mary Hicks, her sister, Belle Moore, and each of their husbands, F. M. Hicks and Dee Moore, explicitly and expressly provided that Mrs. Sarah Jane Russom had a "life estate" and that life estate is described to be—

"the life estate of Mrs. W. Q. Russom, who holds said land as a homestead during her life time."

The deeds between the two daughters and their respective husbands recognized that all the lands being then divided were incumbered by the life estate of Mrs. W. Q. Russom. There is nothing in the entire record to indicate that the value of the entire land was less, as much, or of more value than the value of a homestead as then fixed by the Constitution and by Statute, and said daughters and their husbands were estopped, by their own execution of these instruments containing the averments with respect to the life estate of the daughters' mother, to thereafter say, without a reformation of said instruments, that her estate as homestead did not attach and create a life estate in all of said lands, as fully as if all said lands had been legally set apart by a court judgment on her or their application, as a homestead.

A voluntary oral partition between the children and the widow of their deceased father and husband, of the land he died seized and possessed of intestate, whereby the widow takes certain parts of it and the children certain parts of it, is good, and the children cannot thereafter, nor can the widow thereafter, claim other or further than that as their interest attached to the land so partitioned. Cloyd v. Cloyd, 83 Tenn. 204.

■ It is clear that under the law existing at the time of the death of W. Q. Russom that a husband could take no curtesy in property belonging to the father of the wife who survived her father, with her mother living who survived her daughter, with homestead or dower property assigned.

Upchurch v. Anderson et al., 62 Tenn. 410, 412. In that case it was said:

"By the death, the estate descends subject to this right of dower; and if a quasi seizin in the dower interest, attaches with the devolution of the inheritance upon the heirs, it yields eo instanti with the subsequent assignment of dower, and the assignment by relation takes effect from the moment the right was communicated by the husband's death. The intermediate quasi seizin is, then, in legal contemplation, no seizin at all. Thus, it is said, although the widow's right of entry is suspended until assignment made, her estate does not take its effect out of the ownership of the party assigning, but it is considered as a continuation of the estate of the husband; although the heir entered and had an actual seizin between the death of the husband and the assignment of the dower, yet that intervening seizin does not disturb the continuity of the wife's title; for as soon as her dower is assigned the law supposes her in by relation from the death of the husband, and does away with all mesne seizin, or as Sir Edward Coke expresses it, 'the law adjudgeth no mesne seizin between the husband and wife'. There is not, in contemplation of law, any privity of estate between the dowress and the reversion of the lands set apart to her; * * *"

With respect to the deed from the State to Moore and Hicks, the Court said:

"There was no redemption within the two-year period. On September 16, 1942, the State quitclaimed to Dee Moore and F. M. Hicks. *The relationship of confidence between F. M. Hicks and his six children still existed.* Consequently, his re-purchase from the State operated as a redemption of the land for the benefit of himself and children. The subsequent partition between him and Dee Moore on August 30, 1945, merely placed all members of the Hicks family in the positions they would have been in if there had been no tax sale. *It was Hicks' obligation as a life tenant to pay the taxes.*" (Emphasis supplied.)

It is further evidenced from the Opinion of the learned Chancellor that he based his whole conclusion of a fiduciary relationship existing between F. M. Hicks and his children upon the theory of the life estate by curtesy in F. M. Hicks. In almost the very last statement of his written Opinion, the Chancellor said:

"The defendant, Albert M. Hicks, by his answer asserts that his father, F. M. Hicks, never had a legal or equitable interest in the land prior to the purchase thereof from the State of Tennessee. The Court cannot agree with this statement. F. M. Hicks *was a tenant by the curtesy* prior to his purchase from the State." (Emphasis supplied.)

We are further of the Opinion that the learned Chancellor overlooked the fact that in the original bill, *as amended,* all contention with respect to curtesy of F. M. Hicks had been stricken and that complainants had abandoned their allegations and insistence that the father

acted in a fiduciary capacity on the theory that he had a life estate or curtesy in the real estate involved.

■ Certainly it could not be said that a father could not convey real estate that belonged to him to any one child to the exclusion of all of his other children any more than it could be said that he would have no right to devise real estate in that way. Neither could it be said that if children owned real estate in which the father had no interest whatever and let that real estate be sold for taxes, bought by the State, and after the redemption period had run the State by its deed, as provided by law, had sold the real estate to the father, that this alone would create a purchase by him for the children.

While not directly in point factually, in the case of Prater and Wife et al. v. Hoover et al., 41 Tenn. 544, it is expressly held that:

"But a man cannot be tenant by the curtesy of a remainder or reversion expectant on an estate of a freehold, unless the particular estate fall in during the coverture."

In that case the deeds executed by the wives, who were not privily examined, were not obligatory upon them nor did it in any wise divest them of their respective shares in the land.

In the case of Reed v. Reed, 40 Tenn. 491, 492, the facts were that—

"* * * Andrew Reed married one of the children of William Cootes, and she survived her father, but died before the death of said Celia, leaving several children surviving her, who were also the children of

petitioner, and born after the death of William Cootes.''

Celia Cootes was the widow of William Cootes, and Andrew Reed was undertaking to establish a curtesy in the real estate after the death of his said wife. The Court said:

"The question is, whether Andrew Reed is tenant by the curtesy of his wife's share in the lands which were assigned to Celia Cootes for her dower? This question we answer in the negative. A man cannot be tenant by the curtesy of a remainder or reversion expectant upon an estate of freehold, unless the particular estate be determined during the coverture. Neither can he be tenant by the curtesy, of lands which are assigned to a woman for her dower. If a woman, upon whom lands descend, endows her mother, afterwards marries, has issue, and dies in the lifetime of her mother, her husband will not be entitled to an estate by the curtesy in those lands whereof the mother was endowed — because the daughter's seizin was defeated by the endowment.''

The lands in the instant case were sold for taxes assessed thereto during the life of Mrs. W. Q. Russom. If the wife took that land as a homestead by and with the agreement of the adult children,—which appear to be the facts in this case, then the life tenant, Mrs. W. Q. Russom, was primarily liable for the taxes. We can see no reason why Hicks, in the absence of some contract so to do, would have been liable for any of the delinquent taxes, if he had no curtesy in the real estate.

There is nothing in the entire record to indicate that there was any agreement between Hicks and his children

at the time he took the deed from the State, paid the consideration recited therein, and paid to the County the amount that it required, that he was taking the deed in himself for the benefit of the children.

The result is, therefore, that if the deed from the State is a good and valid deed, F. M. Hicks becomes possessed of an absolute fee simple title. The period of redemption had run.

T. C. A. sec. 67-2023 is as follows:

"A tax deed of conveyance shall be an assurance of perfect title to the purchaser of said land, and no such conveyance shall be invalidated in any court, except by proof that the land was not liable to sale for taxes or that the taxes for which the land was sold have been paid before said sale; and if any part of the taxes for which said land was sold is illegal or not chargeable against it, but a part is chargeable, that shall not affect the sale, nor invalidate the conveyance thereunder, unless it appears that before the sale the amount legally chargeable against the land was paid or tendered to the county trusteé, and no other objection either in form or substance to the sale or the title thereunder shall avail in any controversy involving them."

T. C. A. sec. 67-2025 is as follows:

"No suit shall be commenced in any court of the state to invalidate any tax title to land after three (3) years from the time said land was sold for taxes, except in case of persons under disability who shall have one (1) year in which to bring suit after such disability is removed."

From the date of the purchase of said Real Estate by the State of Tennessee for delinquent taxes for 1931, which sale was confirmed on the 28th day of August, 1940, no attack was made with respect to the sale of said real estate and no effort made to set aside the sale, and no attack upon the title of the defendants until this original bill was filed on August 30, 1956, approximately 16 years thereafter.

Moore and Hicks, after they procured the deed from the State on the 16th day of September, 1942, apparently kept the land as tenants in common until August 30, 1945, at which time they executed the division deed by which F. M. Hicks came into possession of the involved acreage. His deed to his son, Albert Hicks, was executed, delivered and recorded August 31, 1945, and Albert Hicks held the record title unmolested and undisturbed from 1945 until the bill was filed in this cause on the aforesaid date of August 30, 1956.

Counsel for appellees insists that unless dower was assigned as provided by T. C. A. secs. 30-902 to 30-916, to the widow, she can have no dower. His argument is that—

"Under the law in Tennessee no other method for assigning dower is provided and until the widow makes application and follows the procedure outlined above she has no dower assigned to her."

He further argues that—

"The language used in the deeds is a mere recognition of the widow's right to homestead and dower, the assignment of which could only be accomplished by an act by the widow in her own behalf. The deeds themselves do not convey to the widow a homestead

and dower interest but merely recognizes her right thereto. The deeds only recognize the right which she already had under the law but in order for this right to ripen the widow was required to act.''

T. C. A. sec. 30-901 is the statutory provision which directs that the homestead in lands of a decedent inuring to the benefit of his widow or minor children shall be set apart in the same way as her dower.

We cannot follow this argument to a successful conclusion, as related to the facts of the instant case, as revealed by the deeds and the stipulation of the parties. To follow it through would simply be saying that in the absence of a deed from the heirs of an intestate decedent directly to their mother, his widow who had survived, could not be endowed with a life estate in the lands of which her husband died seized and possessed, nor could they execute an instrument between themselves for their benefit and her benefit, which would amount to an estoppel upon their part to deny the very contract executed between themselves for their mother's benefit.

There is another principle involved that apparently the Chancellor overlooked and that is to the effect that these daughters could contract with each other for the benefit not only of themselves but for the benefit of their mother. In other words, regardless of the fact that the mother did not sign the contract, that part of the contract which provided she had a life estate in the whole tract, was evidently a contract between these two daughters for the benefit of their mother, so that she would not have to make application to the courts to have her homestead and dower set apart to her. There can be no doubt that contracts made for the benefit of a third

party may be enforced by such a third party and that such a party might sue in his own right for its breach. Stewart v. Sullivan Co., 196 Tenn. 49, 264 S. W. (2d) 217; E. O. Bailey & Co. v. Union Planters Title Guar. Co., 33 Tenn. App. 439, 232 S. W. (2d) 309; Peoples Bank v. Baxter, 41 Tenn. App. 710, 298 S. W. (2d) 732.

■ Counsel for appellees undertake to support their position by quoting from certain Opinions and saying:

" 'Upon the death of the husband his real estate descends to his heirs at law, or devisee, who has the undivided seizin till an assignment of dower has been made, and who alone can receive rents and profits, and bring suit to recover the possession, and for injuries done to the estate. Until an assignment has been made, there is no privity of estate or of contract between the widow and any tenant of the estate, and she has no right of entry upon the premises. Guthrie v. Owen, 18 Tenn. 339; Thompson v. Stacy, 18 Tenn. 493; White [Whyte] v. Nashville, 32 Tenn. 364. The widow may be ejected by the heirs where she is holding without assignment.' Tool v. Pride, 1 Tenn. [234], 235. (North v. Puckett, et al., 164 Tenn. [100] pp. 102-103 [46 S. W. (2d) 73, 81 A. L. R. 1107].) See also Lee v. Harris, 188 Tenn. [373] at page 377 [219 S. W. (2d) 892]; Edwards v. Hawks, et al, 189 Tenn. [17] at page 24 [222 S. W. (2d) 28]."

We do not find these cases applicable to the situation now being considered. The action of the daughters in the execution of these deeds between themselves, with the provision contained therein, created a seizin in their mother from the moment of the death of her husband,

their father, which neither they nor their heirs can overthrow.

Furthermore, there is not one line of proof in this entire record that the mother had not been in actual possession of the land during her lifetime, even though that would not be necessary in order that she might claim her life estate made up of the homestead, for if these daughters recognize her right of seizin in all the property, they could not deny that she was so seized, neither could their children.

■ It is simply fundamental to say that four elements are necessary to create an estate by the curtesy, viz.:

    (a) marriage;

    (b) seizin of right;

    (c) issue born alive;

    (d) death of the wife.

Only three of these elements appear in the instant case. The life estate of the widow of W. Q. Russom, as recognized and provided by the deeds, prevented "seizin" by either of the daughters unless they survived their mother, and Mrs. Mary Hicks did not survive her mother by several years.

■ At common law, even a parol assignment of dower is recognized, and our statute providing a mode of assignment has not destroyed the right of parol assignment, recognized at common law, when properly made and accepted by the parties. Such is the holding in Cloyd v. Cloyd, supra.

It is not necessary to comment on the question of adverse possession on the part of Albert M. Hicks, fur-

ther than to say that he does not have to depend on such defense in this suit. Neither is it necessary to discuss the plea of laches for the same reason.

The case of Edwards v. Puckett, 196 Tenn. 560, 268 S. W. (2d) 582, 584, decided by the Supreme Court in its Opinion of May 21, 1954, discusses the question of the effect of the statute of limitations by adverse possession, and laches, and all of our cases dealing with the fiduciary relationship existing between the life tenant and the remaindermen. In that case the mother of the complainant, who was living when the case was decided and was a party to the suit, had many years before been expressly decreed a life estate and the child involved had been decreed to own the remainder in a suit where the mother procured a divorce and alimony from her former husband, the exact language in that divorce decree affecting the title to the land involved in Edwards v. Puckett, was to her

*"for and during her natural life time and after her death, to the child."* (Emphasis added.)

As stated in the case of Edwards v. Puckett supra, with which we fully agree, it is said:

" 'A life tenant may be a purchaser at a sale to satisfy an encumbrance; but neither a life tenant nor one claiming under him, who allows the property to be sold for taxes or the satisfaction of an encumbrance, or the interest thereon, can acquire a title adverse to the remainderman or reversioner by purchasing at the sale himself, or through an intermediary, or by obtaining a conveyance of the title acquired by another purchaser at such sale. Such a transaction

amounts simply to a payment or redemption.' 31 C. J. S., Estates, sec. 35, p. 44.

"We think the foregoing is unquestionably the rule of law in Tennessee. It finds support in Miller v. Gratz, 3 Tenn. App. 498; McGee v. Carter, 31 Tenn. App. 141, 148, 212 S. W. (2d) 902.''

The rule thus stated would apply in the instant cause if F. M. Hicks had a life estate as curtesy, which we have determined he did not.

We think that the Chancellor erred in holding that F. M. Hicks held a curtesy in the land in question, and therefore stood in such fiduciary relationship to his children so that he could not alien the absolute title to said property after he had purchased it from the State and he and his co-purchaser from the State, had executed a partition deed to each other. The deed executed by F. M. Hicks to his son, Albert, we think conveyed an absolute title to the property.

Accordingly, the Assignments of Error I, II, IV, and VI are sustained, the Decree of the Chancellor reversed, and complainants' bill dismissed. It goes without saying, further, that the part of the Chancellor's Decree which authorizes recovery by Lora J. Roten and Ruth Dunaway of the sum of $166.66 2/3 each for their part of the timber sold by Albert M. Hicks to Tom Jeff Hurst, is likewise reversed.

The costs of the cause will be paid by the original complainants, appellees in this Court, and their sureties on their cost bond.

Decree accordingly.

Carney and Bejach, JJ., concur.